TOWN OF BROOKLINE & others[1] *vs.* SECRETARY OF THE
COMMONWEALTH.

Suffolk. March 8, 1994. - March 31, 1994.

Present: WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Constitutional Law*, Apportionment of representation, Representative dis-
tricts, Standing. *Municipal Corporations*, Representative districts.

In the circumstances of an action challenging the constitutionality of the
legislative redistricting plan enacted in St. 1993, c. 273, the brief delay
resulting from the plaintiffs' inadvertent filing of their complaint with
the clerk of the Supreme Judicial Court for the county of Suffolk,
rather than with the clerk of the full court, as prescribed by art. 101,
§ 3, of the Amendments to the Massachusetts Constitution, did not re-
quire dismissal on the ground that the action had not been commenced
within the statute's ten-day limitation period. [408-410]

Discussion of the recent history of State legislative redistricting in Massa-
chusetts and the need for redistricting in 1993. [410-412]

Discussion of State and Federal constitutional and statutory issues applica-
ble to a plan for redistricting the House of Representatives of the Com-
monwealth, with reference to population equality [413-414], contiguity
[414], unity of political subdivisions [414], and the requirements of the
Federal Voting Rights Act [414-415].

Summary of the characteristics of the redistricting plan for the State
House of Representatives contained in St. 1993, c. 273, § 1, as relevant
to a challenge to the constitutionality of the plan, and comparison with
the Governor's alternative plan. [415-416]

To the extent that plaintiffs (certain municipalities, voters, and municipal
officials) had standing to challenge the constitutionality of the redis-
tricting plan for representative districts contained in St. 1993, c. 273,
§ 1, this court concluded that the Legislature, in enacting the plan, had
not given impermissible weight to considerations of equal representation
and preservation of the voting strength of minority groups at the ex-
pense of the protection accorded the territorial integrity of political sub-
divisions by art. 101 of the Amendments to the Massachusetts Consti-
tution [417-418], and the court further concluded that the Legislature

[1]The towns of Milton, Randolph, Lynnfield, and Stoneham, joined by
various registered voters and officials of the towns.

had properly taken into account the requirements of Federal law [418-419].

In an original action challenging the constitutionality of the redistricting plan for representative districts of the State House of Representatives contained in St. 1993, c. 273, § 1, this court concluded that the plaintiffs (certain municipalities, voters, and municipal officials) had not carried their burden of showing that the effect of the plan on any plaintiff municipality would be "unnecessary and incompatible with reasonable effort to conform" to the mandate of art. 101 of the Amendments to the Massachusetts Constitution that the Legislature, as "nearly as may be," avoid uniting cities and towns, parts of cities and towns, or separate counties in representative districts. [419-422]

In an original action challenging the constitutionality of the redistricting plan for representative districts of the State House of Representatives contained in St. 1993, c. 273, § 1, this court concluded that the plan's allocation of representation to the city of Boston did not abridge any right secured to the plaintiffs (certain municipalities, voters, and municipal officials) by art. 7 of the Massachusetts Declaration of Rights. [423-424]

The redistricting plan for representative districts of the State House of Representatives contained in St. 1993, c. 273, § 1, did not infringe on the rights of inhabitants of the Commonwealth to vote or to be elected to office, as secured to them by arts. 1, 7, 8, and 9 of the Massachusetts Declaration of Rights. [424]

CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk on December 14, 1993, and in the Supreme Judicial Court for the Commonwealth on December 15, 1993, respectively.

The Suffolk County action was transferred by *Abrams*, J., to the Supreme Judicial Court for the Commonwealth and the cases were consolidated for hearing.

*John P. Flynn*, Town Counsel (*Geoffrey P. Wermuth* with him) for town of Milton & another.

*Peter Sacks*, Assistant Attorney General, for the defendant.

*David Lee Turner*, Town Counsel, for town of Brookline, was present but did not argue.

*William H. Solomon*, Town Counsel, for town of Stoneham, was present but did not argue.

*Paul DeRensis*, Town Counsel, for town of Randolph, joined in a brief.

*John P. Flynn & Geoffrey P. Wermuth*, for town of Belchertown & others, amici curiae, submitted a brief.

GREANEY, J. The plaintiffs, the towns of Brookline, Milton, Randolph, Lynnfield, and Stoneham, and officials and voters of the towns, seek relief in the nature of mandamus against the defendant, Secretary of the Commonwealth, which would invalidate the 1993 redistricting plan for the 160 representative districts of the House of Representatives in the Commonwealth. The plaintiffs maintain that St. 1993, c. 273, § 1, which establishes the new districts, is unconstitutional under art. 101, as amended by arts. 109 and 117 of the Amendments to the Constitution of the Commonwealth,[2] and arts. 1, 7, 8, and 9 of the Declaration of Rights to our Constitution. We first conclude that the plaintiffs' action should not be dismissed. As to the merits, we conclude that the plaintiffs have failed to demonstrate that, in enacting c. 273, the Legislature unduly departed from the directive in art. 101 to respect the political subdivisions during the redistricting process. Accordingly, there is no basis for requiring the Legislature to draw a new redistricting plan, and the defendant is entitled to judgment.

1. *Dismissal.* As has been stated, the 1993 redistricting plan was established by St. 1993, c. 273, § 1. Section 2 of c. 273 provides: "The Supreme Judicial Court shall have jurisdiction of any petition for a writ of mandamus relative to the establishment of one hundred and sixty representative districts under section one of this act. Every such petition

---

[2]Article 101 of the Amendments to the Constitution of the Commonwealth provides, in pertinent part, that the Legislature shall "divide the commonwealth into one hundred and sixty representative districts of contiguous territory so that each representative will represent an equal number of inhabitants, as nearly as may be; and such district shall be formed, as nearly as may be, without uniting two counties or parts of two or more counties, two towns or parts of two or more towns, two cities or parts of two or more cities, or a city and a town, or parts of cities and towns, into one district. Such districts shall also be so formed that no town containing less than twenty-five hundred inhabitants . . . shall be divided."

shall be filed in said court within ten days after the effective date of this act." This provision, in turn, is based on art. 101, §§ 1 and 3. Section 1 authorizes the Legislature to limit the time during which challenges to redistricting plans may be filed. Section 3 states, in pertinent part: "Original jurisdiction is hereby vested in the supreme judicial court upon the petition of any voter of the Commonwealth, filed with the clerk of the supreme judicial court for the Commonwealth, for judicial relief relative to the establishment of House of Representatives . . . districts." The bill which became St. 1993, c. 273, was placed before the Governor on November 22, 1993. The Governor did not act on the bill, and it became law ten days later.[3]

The plaintiffs filed their first complaint on December 14, 1993, in the Supreme Judicial Court for Suffolk County.[4] At an initial status hearing, it was suggested to a single justice that the complaint had been improperly filed in the county court. On December 15, 1993, the plaintiffs filed a virtually identical complaint in the Supreme Judicial Court for the Commonwealth. The defendant filed a motion to dismiss the county court action for lack of jurisdiction (because it had been filed in the wrong court), and a separate motion to dismiss the full court action (because it allegedly had not been filed within the ten-day period specified by St. 1993, c. 273, § 2). The plaintiffs opposed the motions to dismiss, and moved (a) to substitute the full court complaint for the county court complaint, and (b) to deem the county court complaint filed in the full court. The single justice consolidated the two cases and placed all issues before us for decision.

---

[3]A brief has been filed on behalf of the towns of Belchertown, Easton, and Tewksbury as amici curiae, in which it is asserted that the division in St. 1993, c. 273, § 1, of these towns among different representative districts violates art. 101. These towns were required to file an action for relief from the districts established in c. 273, within ten days of the effective date of the legislation. They did not do so. They may not acquire standing to challenge c. 273, as it affects them, by joining as amici curiae in a suit filed by other municipalities.

[4]No contention is made that this filing was untimely.

Section 3 of art. 101 makes clear that an action challenging the constitutionality of a redistricting plan is to be brought directly before the full court. See *Merriam* v. *Secretary of the Commonwealth*, 375 Mass. 246, 249 n.5 (1978) ("This action was filed first with the clerk of the Supreme Judicial Court for the Commonwealth, as prescribed by art. 101, § 3, and was then transferred to this court for Suffolk County"). Section 2 of St. 1993, c. 273, repeats this filing requirement. Despite the plaintiffs' filing of their first complaint in the wrong court, we do not order dismissal of the full court complaint. The deficiency was promptly remedied with the filing of a new complaint in the full court, and the parties moved expeditiously to prepare a statement of agreed facts and a list of agreed and disputed exhibits. The single justice expressed her clear intention to have the proceedings put rapidly before the full court. In the circumstances, we do not view any misstep as fatal. We turn to the merits of the plaintiffs' case.

2. *Recent history of redistricting in Massachusetts and the need for redistricting in 1993.* In December, 1992, the Legislature appointed a bipartisan joint special committee "to study a division of [the] Commonwealth into one hundred and sixty representative districts, forty senatorial districts, and eight executive council districts, based on the results of the nineteen hundred and ninety federal census." The committee approached a task complicated by a recent history, described more fully below, of frequent and significant changes in the standards applicable to the establishment of representative districts, and a series of legal challenges, based on Federal law, to recent redistricting plans. The committee also was constrained by Federal and State constitutional, as well as statutory, requirements and directives, which are difficult to balance.

By art. 92 of the Amendments to the Massachusetts Constitution, adopted by the people in 1970, the Legislature was, for the first time, assigned the responsibility of dividing the Commonwealth into representative districts. In 1974, the people approved art. 101, which reduced the size of the

House of Representatives from 240 to 160 members, thus requiring a complete revision of the Commonwealth's representative districts. Prior to 1993, the Legislature enacted three successive House redistricting plans in accordance with art. 101. The first, St. 1977, c. 277, was based on the 1975 State census. Alone among the redistricting plans enacted under art. 101, the 1977 plan provoked no court challenge. The second plan, St. 1987, c. 341, as amended by St. 1987, c. 715, was based on the 1985 State census. It was challenged before a three-judge panel of the United States District Court for the District of Massachusetts. That court invalidated the plan, concluding that a significant deviation from population equality among the districts violated the equal protection requirements contained in the Fourteenth Amendment to the United States Constitution. See *Black Political Task Force v. Connolly*, 679 F. Supp. 109, 121-131 (D. Mass. 1988). In response to this decision, the Legislature enacted a new plan in St. 1988, c. 11.

In 1990, the people approved art. 117, abolishing the State census and replacing it with the Federal census as the basis for representative, senatorial, and councillor districts in the Commonwealth. Ward and precinct lines in the Commonwealth's cities (with the exception of Boston) and towns were redrawn, pursuant to St. 1992, c. 403, to conform to Federal census boundaries. Data from the 1990 Federal census showed an increase in the Commonwealth's population according to the 1985 State census from 5,746,440, to 6,016,425, accompanied by numerous shifts in population from one location to another. From the viewpoint of equality of representation, the 1990 Federal census data called into question the composition of ninety of the 160 representative districts established by the 1988 plan. In 1991, the Black Political Task Force and the Massachusetts Republican Committee brought separate lawsuits in the United States District Court, claiming that, in view of the 1990 Federal census figures, the representative districts established by St. 1988, c. 11, violated the equal protection requirements contained in the Fourteenth Amendment. The suits sought to force the

Legislature to draw new House and Senate districts in time for the 1992 State elections. A Federal three-judge court consolidated the cases and held that, because the Commonwealth was following a reasonable plan for redistricting in time for the 1994 elections, it was not required by the Fourteenth Amendment to redistrict before the 1992 elections. The suits also sought to enjoin the use of the 1988 districts in the 1992 elections on the basis of the Federal Voting Rights Act, 42 U.S.C. §§ 1973(a) et seq. (1988). A majority of the court assumed, for purposes of decision, that "application of the [1990 Federal census data would] reveal sufficient basis for reconstituting a number of districts so as to give them a greater minority population." Black Political Task Force *vs*. Connolly, Civ. Nos. 91-12750-H, 91-12751-H (D. Mass. Feb. 11, 1992). The majority declined, however, to issue a preliminary injunction requiring redistricting in time for the 1992 elections in view of the fact that "long planned efforts at reapportionment are . . . going forward on schedule." In these circumstances, the majority of the three-judge court concluded, the balance of equities did not favor disruption of the 1992 State elections.[5]

3. *Federal and State constitutional and statutory requirements and directives*. The bipartisan committee[6] assigned the task of redistricting issued its recommended plan on November 3, 1993. The plan had the support of all members of the committee. After debate and the adoption of certain amend-

---

[5]The dissenting judge concluded that the plaintiffs had succeeded in demonstrating a likelihood of success on the merits of their Voting Rights Act claim, and stated that, in his view, concerns about administrative inconvenience and possible disruption of the electoral process were insufficient justifications for denying relief to the plaintiffs. Black Political Task Force *vs*. Connolly, Civ. Nos. 91-12750-H, 91-12751-H, (D. Mass. Feb. 11, 1992) (Pettine, J., dissenting).

[6]The House members of the committee included five Republicans and fifteen Democrats, a ratio that slightly favored Republican members in comparison to the Democratic to Republican ratio of the House as a whole. The defendant specifies in his brief that two of the seven black members of the House were on the committee.

ments,[7] the amended plan was approved by the Legislature and placed before the Governor, who sent the plan back to the House of Representatives with an entirely different redistricting plan as a proposed amendment. The Legislature declined to adopt the Governor's plan, and the plan was enacted as c. 273. The report accompanying the bipartisan committee's recommended plan identified Federal and State constitutional and statutory requirements which had shaped the plan as follows.

a. *Population equality.* The Constitutions of the United States and the Commonwealth require approximate population equality among representative districts. As has been previously noted, see note 2, *supra*, art. 101 requires that representative districts be drawn so that each representative "will represent an equal number of inhabitants as nearly as may be." We have not had occasion to determine fully the limits of permissible deviation from this equal representation requirement.

As the bipartisan committee noted in its report, the Federal courts have dealt with the requirement of equal representation under the Fourteenth Amendment's equal protection provision. The United States Supreme Court has stated, and has recently reaffirmed, in support of the "one person, one vote principle," that "minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State. Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within the category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State." *Voinovich* v. *Quilter*, 113 S. Ct. 1149, 1159 (1993), quoting *Brown* v. *Thomas*, 462 U.S. 835, 842-843 (1983).

---

[7]It appears that nine or ten of the plan's 160 districts were affected by amendments.

A State reapportionment plan with a maximum population deviation greater than ten per cent may still pass constitutional scrutiny if that plan advances a rational and nondiscriminatory objective which the State has consistently sought to honor. *Brown* v. *Thomas, supra* at 843-845. "[A] desire to preserve the integrity of political subdivisions may justify an apportionment plan which departs from numerical equality." *Abate* v. *Mundt*, 403 U.S. 182, 185 (1971). *Brown* v. *Thomas, supra* at 843. In *Black Political Task Force* v. *Connolly*, 679 F. Supp. 109 (D. Mass. 1988), however, a three-judge Federal court for our district rejected the claim that the Commonwealth has consistently respected the integrity of its political subdivisions so as to justify a greater than normal deviation from the "one person one vote" principle. *Id.* at 124-130.

b. *Contiguity.* Article 101 requires the Legislature to ensure that each of the 160 representative districts consist of contiguous territory. See note 2, *supra.*

c. *Political subdivisions.* In addition to discouraging the division of cities, towns, and counties among different districts, art. 101 contains a separate prohibition against dividing any town containing less than 2,500 inhabitants.

d. *Voting Rights Act.* The bipartisan committee also considered the possible impact of the Federal Voting Rights Act of 1965 on the 1993 redistricting plan. That legislation expressly "prohibits the imposition of any electoral practice or procedure that 'results in the denial or abridgement of the right of any citizen . . . to vote on account of race or color.' " *Voinovich* v. *Quilter, supra* at 1155, quoting 42 U.S.C § 1973(b) (1988). In simplified terms, the Voting Rights Act prohibits the creation of electoral districts that tend to dilute the voting power of a minority population by dividing its members among several districts. *Id.* The Act also forbids "packing" minority voting strength into, for example, a single district, where the minority population might otherwise

have constituted a majority in more than one electoral district. *Id.* See *Thornburg* v. *Gingles,* 478 U.S. 30 (1986).[8]

4. *Summary of relevant characteristics of the 1993 redistricting plan and the Governor's competing plan.* The 1990 Federal census indicated a Massachusetts population of 6,016,425. This figure, divided by 160 (the number of representative districts established by art. 101), produced an ideal district population figure of 37,603. The parties agree that c. 273 establishes no districts that deviate from the ideal district population by more than plus or minus five per cent. The plan recommended to the Legislature created four majority black districts in Boston, based on the voting age population. The plan also contained a district in Lawrence in which Hispanics constitute a majority of the voting age population.[9]

Eighty-six of the districts established by c. 273 contain portions of at least one city or town combined with another, or a part of another, city or town. Of these eighty-six districts, twenty-nine contain a portion of one city or town, together with another city (or cities) or town (or towns); forty-six contain a portion of either two cities or towns; ten contain a portion of either three cities or towns. Twenty-nine of the eighty-six districts, and an additional seven districts, contain territory in two or more counties.[10] All the districts consist of contiguous territory.

---

[8]Decisional law interpreting and applying the provisions of the Voting Rights Act is extremely complex. We express no opinion on whether St. 1993, c. 273, complies with that legislation. This case does not require us to do so.

[9]The plan creates two additional districts in which black and Hispanic voters together constitute a majority of the voting age population. According to the defendant, it is unclear whether black and Hispanic voters, combined as a theoretical voting block, constitute a "politically cohesive" group for the purposes of the Voting Rights Act.

[10]By way of comparison, the 1988 redistricting plan established seventy-two districts containing portions of at least one city or town combined with another, or part of another, city or town. Fifteen of these districts, and an additional eight districts, contained territory in two or more counties. The

Under c. 273, Milton, with a 1990 population of 27,725, is divided among three districts; Brookline, with a 1990 population of 54,718 is divided among five districts;[11] Lynnfield, with a 1990 population of 11,274 is divided among two districts; Randolph, with a 1990 population of 30,093 is divided among three districts; and Stoneham, with a 1990 population of 22,203, is divided among two districts.

The Governor's plan, which we describe for purposes of comparison to c. 273, also had maximum population deviations within the plus or minus five per cent range of the ideal district population. Two districts contained territory that was not contiguous. The Governor's plan contained sixty-eight districts uniting parts of cities or towns. Under his plan, Brookline, Randolph and Stoneham would have been divided in two; and Milton and Lynnfield would have remained undivided.[12]

plan contained districts that deviated by more than plus or minus five per cent from the ideal district population based on the 1985 State census.

The 1987 plan established thirty-seven districts containing portions of at least one city or town combined with another, or part of another, city or town. Seven of these districts, and fifteen additional districts, contained territory in two or more counties. This plan contained districts that deviated by more than plus or minus five per cent from the ideal district population based on the 1985 State census. (As has been previously noted, the plan was invalidated on this basis by a three-judge Federal court. See *Black Political Task Force* v. *Connolly*, 679 F. Supp. 109 [D. Mass. 1988]).

The 1977 plan established thirty-eight districts containing portions of at least one city or town combined with another, or part of another, city or town. Five of these thirty-eight districts, and an additional fifteen districts, contained territory in two or more counties. The 1977 plan contained districts.that deviated by more than plus or minus five per cent from the ideal district population based on the 1975 State census.

[11]As to Brookline only, the plaintiffs' brief furnishes additional data on its division. Of Brookline's 54,718 inhabitants, 37,925 inhabitants constitute the whole of the Fifteenth Norfolk District. The Tenth Suffolk District contains 3,273 inhabitants; 3,253 are included in the Eleventh Middlesex District; 6,820 are included in the Eighteenth Suffolk District; and 3,446 are included in the Eighth Suffolk District.

[12]In his communication to the House of Representatives, the Governor asserted that the plan devised at his direction was preferable to c. 273, because it created ten districts in which a majority of the voting age population were members of a minority group. The defendant Secretary points

5. *The plaintiffs' challenge to c. 273, § 1, under art. 101.* In the plaintiffs' view, art. 101 was included in our Constitution to protect the integrity of political subdivisions of the Commonwealth in any redistricting process, thus, as far as they are concerned, preserving to municipalities a strong voice in political matters before the Legislature. They argue that art. 101's directive to avoid, as "nearly as may be," uniting cities and towns, parts of cities and towns, or separate counties, in representative districts was intended to guard against excessive fragmentation of political subdivisions. In a comprehensive attack on the provisions of c. 273, they essentially contend that the Legislature improperly elevated the goals of equal representation, and the preservation of minority voting strength, over what they consider the territorial integrity directive embodied in art. 101. The plaintiffs do not advocate the adoption of the Governor's redistricting plan, but they suggest that its provisions demonstrate that a plan more nearly complying with the territorial directive of art. 101 feasibly could have been developed.

We note at the outset that the plaintiffs do not have standing to challenge c. 273 in its entirety. Their interest, and our inquiry into the validity of the legislation, is limited to its effect on them. See *Hynson, Westcott & Dunning, Inc.* v. *Commissioner of Pub. Health,* 346 Mass. 606, 610 (1964) (as general principle, "only one whose rights are impaired by a statute can raise the question of its constitutionality, and he can object only as it applies to him"). The number of

out that the Governor's plan included seven districts in Boston, two in Springfield, and one in Lawrence, where blacks, Hispanics, and Asians, in combination, constituted more than fifty per cent of the voting age population. According to the Secretary, the Governor's claim of ten districts in which minority group voters constituted a majority rested on the questionable assumption that voters from different ethnic groups form a politically cohesive bloc. The Governor's plan included only two districts in Boston, and one in Lawrence, where members of a single minority group constituted a majority of the voting age population.

The Secretary also points out that the Governor's plan placed forty-two State representatives (forty of whom were Democrats) in the same district as one or two other representatives. The two Republicans were placed in districts in which the other representative was a Democrat.

town, city, and county boundaries crossed by representative districts in c. 273 is evidence that can be considered for purposes of determining whether the legislation sufficiently complies with the territorial directive of art. 101.

We reject the contention that, in enacting c. 273, the Legislature erred by giving undue emphasis to population equality among districts and by taking into consideration the Federal Voting Rights Act. The principle of electoral equality has long been recognized as one of the fundamental rights protected by our Constitution. In 1916, Chief Justice Rugg, speaking of art. 21 of the Amendments to our Constitution, observed: "The great principle established by this amendment is equality of representation among all the [citizens] of the Commonwealth. That is a fundamental principle of representative government. . . . There can be no equality among citizens if the vote of one counts for considerably more than that of another in electing public officials." *Attorney Gen.* v. *Suffolk County Apportionment Comm'rs*, 224 Mass. 598, 604 (1916). In art. 101, the people placed population equality on at least the same footing with the respect expressed for the cohesiveness of political subdivisions.

In addition, the Legislature acted properly when considering c. 273, by taking into account the requirements of Federal law. Reapportionment for State elections is "primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Growe* v. *Emison*, 113 S. Ct. 1075, 1081 (1993), quoting *Chapman* v. *Meier*, 420 U.S. 1, 27 (1975). A plan developed by a State legislature, which complies with State law, may still be invalidated if found to violate either the Federal Constitution or a Federal statute. *Voinovich* v. *Quilter, supra* at 1157. A State legislature which fails to take into account applicable provisions of Federal law when it enacts a redistricting plan needlessly invites Federal litigation and the intrusion of the Federal courts into the State redistricting process. In such a case, a State legislature could fairly be said to have shirked its responsibility.

The recent history of redistricting in Massachusetts, described above, plainly indicates that Federal intervention was more than a speculative or hypothetical possibility. A plan with deviations greater than ten per cent from the ideal district population would have created a prima facie case of discrimination, see *Brown* v. *Thomson, supra* at 842-843, and would be, therefore, a call for litigation. In addition, it appears that there was a basis in fact for a Voting Rights Act challenge to the Commonwealth's 1988 representative districts. See Black Political Task Force *vs.* Connolly, *supra.* When it enacted c. 273, the Legislature properly considered Federal mandates and our long-standing constitutional preference for equal representation. See *Wolpoff* v. *Cuomo,* 80 N.Y.2d 70, 77-78 (1992). The issue that must be resolved is whether, once these various mandates and considerations are taken into account, the Legislature has unduly departed from the directive in art. 101, on which the plaintiffs rely.

6. *Article 101.* The parties do not agree on the proper interpretation of the directive in art. 101 to avoid, as nearly as may be, the unification of political subdivisions within representative districts. We now examine that question. In construing a constitutional provision, we look to its language and structure, bearing in mind that "the Constitution 'is a statement of general principles and not a specification of details. . . . It is to be interpreted as the Constitution of a State and not as a statute or an ordinary piece of legislation.'" *McDuffy* v. *Secretary of the Executive Office of Educ.,* 415 Mass. 545, 559 (1993), quoting *Cohen* v. *Attorney Gen.,* 357 Mass. 564, 571 (1970). *Tax Comm'r v. Putnam,* 227 Mass. 522, 523-524 (1917). The defendant, focusing on the term "unite" in art. 101, contends that the provision does not address the unnecessary, or excessive, division of a city or town which cannot form a single district (or multiple districts containing only its inhabitants) because its population deviates significantly from the ideal district population or a multiple of that figure. In the defendant's view, a district that unites whole political subdivisions is as flawed,

from the perspective of art. 101, as a district which unites only parts of its constituent political subdivisions.

This is too restrictive a view of the import of the provision. By its command to respect, "as nearly as may be," the territorial integrity of municipalities, art. 101 was adopted with the goal of preserving to these political subdivisions a strong voice in the Legislature, which regularly considers and enacts legislation affecting the interests of municipalities. A municipality certainly will have a stronger voice with a given representative to the extent that its inhabitants constitute a significant bloc of voters in the representative's district. The plaintiffs, all of which assert that c. 273 divides them more than is necessary, appropriately rely on art. 101 to support their claim. We ask, therefore, whether the plaintiffs have made a sufficient showing on their claim of excessive division to invalidate the provisions of c. 273 that affect them.

The drawing of a redistricting plan is, of course, primarily the responsibility of the Legislature. It is apparent from the numerous factors pointed out above that must go into the creation of a lawful plan, that this is by no means a simple endeavor. As a general principle, "[a]ll rational presumptions are made in favor of the validity of every act of the legislative department of government, and the court will not refuse to enforce it unless its conflict with the Constitution is established beyond reasonable doubt." *Merriam* v. *Secretary of the Commonwealth*, 375 Mass. 246, 254 (1978), quoting *Perkins* v. *Westwood*, 226 Mass. 268, 271 (1917). While the *Merriam* decision also speaks of judging a redistricting plan from the viewpoint of whether the statutory division is so "unreasonable as to be 'vicious in its nature,' " *id.* at 263, we think the more proper inquiry, in light of the several directives of art. 101, is whether the effect of the plan on a municipality is "unnecessary and incompatible with reasonable effort to conform to the requirements of the Constitution." *Brophy* v. *Suffolk County Apportionment Comm'rs*, 225 Mass. 124, 126 (1916). In practical terms this standard requires a plaintiff to demonstrate that the constitutional requirement of equal representation "can be achieved [and

other pertinent considerations satisfied] without dividing a municipality and [that] an entire municipality can be kept in one district without a 'ripple effect' on other defined districts." *Merriam* v. *Secretary of the Commonwealth, supra* at 264 (Wilkins, J., dissenting). If this can be shown, then "dividing that municipality is unconstitutional in the absence of some reason [given by the Legislature] justifying the division." *Id.* See *id.* at 263 (plaintiff challenging a redistricting plan has burden of showing that the plan violates art. 101). The legislative justification for the division, if that stage of the inquiry is reached, would be entitled to a high degree of deference. It is not a judicial function to decide whether a plan can be designed which is superior to the one designed by the Legislature. Rather, it is our duty to determine whether the legislative plan complies with constitutional requirements. See *Wolpoff* v. *Cuomo, supra* at 78.

Here, the plaintiffs have not met their burden. As has been previously noted, they basically have asserted that the number of city, town, and county boundaries that are crossed in the districts created by c. 273 conclusively establish that the plan violates art. 101. None of the plaintiffs has proposed any alternative plan for itself (and the cities or towns surrounding it) which would honor its territorial integrity to a greater extent than does c. 273.[13]

If we consider the Governor's plan as an alternative (which the plaintiffs expressly do not advocate, although they assert that the plan is more faithful to the territorial directive of art. 101), it cannot be found that the Legislature departed from the requirements of art. 101. This is especially the case in view of the other legitimate factors that had to be taken into consideration, and the "ripple effects" of adopting

---

[13]The plaintiffs' assertion that certain of the districts created by c. 273 have odd configurations misses the mark. Our Constitution does not require that districts be compact. The Legislature that originated art. 101 considered, but rejected, several versions of the amendment that would have included a compactness requirement. Article 101 contains an unconditional contiguity requirement, which is fully observed in c. 273.

the alternatives proposed by the Governor.[14] As has been previously noted, the Governor's plan divided Brookline into only two districts. However, it did so at the expense of Newton, which in the Governor's plan was divided among four districts, rather than three as in c. 273, and Boston, which the Governor's plan divided among nineteen districts, rather than the seventeen districts in c. 273. In addition, the Legislature reasonably could have concluded that the districts created by c. 273 were more likely to satisfy Federal Voting Rights Act requirements, a judgment well within legislative discretion. See note 12, *supra.*

As to Randolph, it appears that the Governor's plan, which divided Randolph two ways (rather than the three-way division found in c. 273), created divisions of Weymouth, Canton, and Dedham not found in c. 273.[15] From the viewpoint of art. 101, it was well within the discretion of the Legislature to prefer the treatment given to these cities and towns in c. 273. Similarly, as to Lynnfield, the Governor's plan preserved its integrity, but with a ripple effect on the territorial integrity of Methuen.[16] The choices made by the Legislature in c. 273, appear justified. We conclude, therefore, that no violation of art. 101 has been shown.

---

[14]The plaintiffs argue that this court may not consider speculative or hypothetical justifications for the districts created in c. 273. The report to the Legislature accompanying the bipartisan committee's recommended redistricting plan identified, as factors that shaped the plan, (a) population equality among districts; (b) the Federal Voting Rights Act; and (c) respect, "to the extent reasonably possible," of the political subdivisions throughout the Commonwealth. We may consider the report as indicative of the constitutional and legal factors that influenced the formation of c. 273, and, inferentially, the formation of particular districts. See *Merriam v. Secretary of the Commonwealth*, 375 Mass. 246, 261-262 (1978).

[15]Chapter 273 divided Milton, Randolph, and Quincy three ways; Weymouth and Holbrook two ways; and left undivided Braintree, Canton, Dedham, and Avon. The Governor's plan divided Quincy and Weymouth three ways; Randolph, Canton, and Dedham two ways; and left undivided Milton, Holbrook, Avon, and Braintree.

[16]Stoneham fared no better under the Governor's plan than it did under c. 273.

7. *Article 7 challenge.* The plaintiffs state that the population of Boston for purposes of redistricting is 574,283. They divide that number by the ideal district size of 37,603, and conclude that Boston is theoretically entitled to 15.3 districts. They point out that, under c. 273, Boston has ten entirely Boston districts, and six other districts in which its voters constitute a majority.[17] The plaintiffs argue from this that c. 273 has given Boston disproportionate representation in violation of art. 7 of the Declaration of Rights, set forth below.[18] We reject the argument.

In the first place, art. 7 speaks essentially to a right of the people to institute and change government and not to challenges to statutory classifications.[19] Even by the language of art. 7, if there was any "disproportionate representation of Boston," a point we shall discuss in a moment, it would not inure to the "private interest of . . . [a] class of men."

There is, however, no "disproportionate representation of Boston" or underrepresentation of the plaintiffs, particularly Brookline and Milton. All the districts including parts of Brookline, Milton, and Boston (and all the other districts in c. 273) are within the plus or minus five per cent standard of the ideal district size. See *Legislative Redistricting Cases,* 331 Md. 574, 596 (1993) (rejecting claim that plan discriminated in favor of the city of Baltimore; representatives represent people, not territory, and all districts were within the plus or minus five per cent standard). Further, art. 101 di-

---

[17]A portion of Boston is included in a seventeenth district (the Nineteenth Suffolk) where Boston's voters constitute a substantial minority.

[18]Article 7 of the Massachusetts Declaration of Rights provides: "Government is instituted for the common good; for the protection, safety, prosperity, and happiness of the people; and not for the profit, honor, or private interest of any one man, family or class of men. Therefore the people alone have an incontestable, unalienable, and indefeasible right to institute government; and to reform, alter, or totally change the same, when their protection, safety, prosperity and happiness require it."

[19]We have never held that art. 7 creates an equal protection right, although we have stated that art. 7 may be one of those constitutional provisions under which "equal protection . . . considerations may arise." *Opinion of the Justices,* 408 Mass. 1215, 1223 (1990) (referring to arts. 1, 6, 7, and 10).

rects that each representative "represent an equal number of inhabitants," not cities and towns, thereby requiring equal representation, in the sense that persons are placed in a district that has the same number of inhabitants as every other district, "as nearly as may be." The representatives from the Suffolk districts represent all the inhabitants of their districts no matter where those inhabitants live. We cannot assume, in the absence of any proof, that representatives elected from Suffolk districts, which include parts of Boston and other municipalities, will ignore the interests of non-Boston inhabitants. Finally, the Legislature could not give Boston exactly 15.3 representatives. That number had to be rounded up or down, and art. 101 does not require rounding in any particular direction. Rounding up to sixteen districts populated by a majority of Boston voters is reasonable. Rounding down to fifteen districts would also have been reasonable, but not required. Chapter 273 does not offend art. 7.

8. *Other challenges.* Finally, the plaintiffs claim that c. 273 infringes on the rights of their voters to vote for or to be elected as a representative in violation of arts. 1, 7, 8, and 9 of the Massachusetts Declaration of Rights concerning, in various ways, rights of the people and voting rights. We reject these arguments.

There is nothing to show that c. 273 places any burden on the rights of plaintiffs' inhabitants to vote. In particular, there is nothing to show that c. 273 contravenes art. 9[20] by denying any qualified person the right to seek election, or the opportunity to be elected, as a representative in one of the 160 districts.

The action originally commenced in the Supreme Judicial Court for Suffolk County is dismissed. Judgment is to be entered on the docket of the Supreme Judicial Court for the Commonwealth declaring that the redistricting plan in St.

---

[20]Article 9 provides: "All elections ought to be free; and all the inhabitants of this Commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments."

1993, c. 273 does not violate art. 101, and otherwise denying the relief requested by the plaintiffs.

*So ordered.*